**Lucien LOUIS, Wilner Luberisse, Jean Louis Servebien, Pierre Silien, Serge Verdieu, Milfort Vilgard, Joel Casimir, Job Dessin and Prophete Talleyvand, on behalf of themselves and all others similarly situated; and the Haitian Refugee Center, Inc., a non-profit membership corporation, on behalf of itself and its members, Plaintiffs,**

**v.**

**Alan NELSON, Commissioner, Immigration and Naturalization Service, Joe Howerton, District Director, Immigration and Naturalization Service, District VI; Lee Rowland, Assistant District Director of Deportation, Immigration and Naturalization Service, District VI; Cecilio Ruiz, Officer in Charge, Krome Avenue North Detention Facility; Immigration and Naturalization Service; and William French Smith, Attorney General of the United States, Defendants.**

**No. 81–1260–CIV–EPS.**

United States District Court,
S. D. Florida.

June 18, 1982.

Ira J. Kurzban, Kurzban, Kurzban & Weinger, Miami, Fla., Bruce Winick, Univ. of Miami School of Law, Coral Gables, Fla., Irwin P. Stotzky, Vera Weisz, Miami, Fla., Michael J. Rosen, Miami, Fla.; Robert E. Juceam, Irwin Blum, Terrence A. Corrigan, Anne Golden, Mary B. Gilmore, Robin A. Fleischner, Jeffrey Susskind, New York City, for plaintiffs.

Robert Bombaugh, Dept. of Justice, Civ. Div., Washington, D. C., Thomas E. Moseley, Sp. Asst. U. S. Atty., Miami, Fla., for defendants.

Jim Peters, Dept. of Legal Affairs, Tallahassee, Fla., for State of Fla., intervening defendant.

## MEMORANDUM OPINION [1]

SPELLMAN, District Judge.

"Life is like an onion;
you peel off one layer at a time,
and sometimes you weep."

  Carl Sandburg

This case has been described by the Government as nothing more than an attack on the proper constitutional effort of the United States to protect its borders from invasion. It has been described by the Plaintiffs as the worse possible case of the Government of the United States engaging in invidious discrimination.

---

1. This cause was tried before the Court sitting without a jury. The following Memorandum Opinion shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

The detention policy giving rise to this lawsuit has been described by some in the news media as a moral disgrace and by others as simply President Reagan's answer to Carter's timidity.

The policy attempted to be formulated and implemented has been both praised and criticized before Congress.

The religious leaders have assailed this matter as a moral issue; the Attorney General of the United States as a political decision.

The letters received by this Court from the outset of receipt of this case in December of 1981 make it clear that to whomever this matter is addressed it is received neither dispassionately, objectively or without some bias having been formed well in advance.

This opinion, the Court fears, will lack the understanding necessary to convey the complexity of the issues formed and the absolute necessity that in recognizing the right of the executive to exercise certain inherent powers, we must never lose sight of the rule of law. It is hoped that in the passioned subjectivity and prejudice of those that read this opinion those that assert detention to be morally wrong must realize that the executive branch of Government must sometimes adopt drastic policies to achieve purposes otherwise unattainable; and to those who would assert the omnipotent power of government to recognize that in adopting such policies they are never above the rule of law, however well intended their actions.

The primary question raised by this action is whether an excludable alien can be incarcerated during the pendency and possible appeal of his claim for admission to this country. This case in a nutshell involves the individual right of freedom versus the right of the United States to enforce the immigration laws of this country.

The sovereign United States government has an absolute right to control its borders. "The right to do so stems not only from legislative power, but is inherent in the executive power to control the foreign affairs of the nation. *United States v. Cur-*

*tis-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255; *Fong Yue Ting v. United States*, 149 U.S. 698, 713, 13 S.Ct. 1016, 1022, 37 L.Ed. 905. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power." *Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950).

Congress has passed extensive legislation governing the admission of aliens into this country. The legislation provides the executive with a [relatively] clear indication of Congress' view of immigration policy and a way to carry out their intent.

> The basic premise of the immigration law is that no alien may enter the United States unless his entry is authorized by statute. An alien thus cannot lawfully come across the border of this country unless the law sanctions his entry. Conversely, an alien who complies with the legislative directives has a right to enter if he presents himself at a port of entry.

1 C. Gordon & H. Rosenfeld, Immigration Law and Procedure § 2.1b (footnotes omitted).

The chief and almost exclusive concern of the immigration laws is with aliens who seek to enter the United States from abroad. Congress has imposed three types of restrictions on such aliens: qualitative restrictions bar certain classes of undesirable aliens, principally on health, moral, criminal, political or economic grounds. Numerical limits govern those aliens who come to stay permanently. Documentary restrictions establish identity and assure compliance with other prescribed requirements by commanding entering aliens to obtain and present certain documents, usually in the form of passports or equivalent papers.[2]

Congress has charged the executive branch with the duty to enforce the immigration laws. The Immigration and Naturalization Service (hereinafter INS), a component of the Department of Justice, is the agency that carries out the enforcement

---

**2.** *See generally* 2 C. Gordon and H. Rosenfeld, Immigration Law and Procedure § 2.1b.

function of the executive branch in matters relating to immigration.[3] INS has found the most efficient way to carry out this mandate is by requiring all aliens seeking admission to present themselves to immigration for inspection at designated ports of entry.[4] Upon arriving at immigration, the aliens must establish their admissibility to the satisfaction of the immigration officer in charge.[5] Admissibility is easily established if the alien has in his possession all of the documents necessary to enter provided these documents are in good order and not suspect.[6]

Many aliens choose not to follow the prescribed procedures for entering the United States. Some seek to enter surreptitiously at night, by crossing the border in remote, inaccessible areas; others through fraud. Within this class of aliens, motives vary from a simple desire to seek a better life to some individuals who truly seek to escape persecution and repression in their homeland.

If an alien successfully crosses the border surreptitiously, the chances of being apprehended at a later time are slim. INS does not have the resources to make large scale searches for illegal entrants, to proceed against them and possibly expel them. It is much more efficient to use border patrol personnel to apprehend and deter aliens seeking to enter the country unlawfully. INS' efforts in this regard are of marginal effectiveness because this nation's borders are too expansive to be effectively patroled without continuous use of hundreds of thousands of guards.

All of INS' efforts are designed to ferret out aliens who for one reason or another are inadmissible, thereby keeping the number and character of immigrants entering the United States in line with congressional policy. Inadmissible aliens are either deportable or excludable; the former being persons who have effected an "entry", the latter being persons deemed not to have entered the United States.[7] The irony of this distinction is that deportable aliens, many of whom entered the country surreptitiously, are given more rights under the law than excludable aliens who present themselves to immigration.[8] The practical effect of this is to encourage those who attempt to sneak across the border because they are rewarded with greater rights than those aliens who attempt to comply with our laws.

Regardless of whether an alien is excludable or deportable, if the alien claims to be admissible INS must determine the merits of the claim.[9] In the case of excludable aliens, Congress has enacted legislation giv-

3. 8 U.S.C. § 1103.

4. 8 U.S.C. § 1225; 8 C.F.R. §§ 100.4, 235.1.

5. 8 U.S.C. § 1225.

6. 8 C.F.R. § 235.1.

7. 8 U.S.C. § 1101(a)(13) defines the term "entry" to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise..." See generally Barber v. Gonzales, 347 U.S. 637, 641, 74 S.Ct. 822, 824, 98 L.Ed. 1009 (1954) and cases cited therein. See also 8 U.S.C. §§ 1226, 1251, 1252.

8. 8 U.S.C. §§ 1226, 1252. See The Chinese Exclusion Cases, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); Lem Moon Sing v. United States, 158 U.S. 538, 15 S.Ct. 967, 39 L.Ed. 1082 (1895); United States v. Ju Toy, 198 U.S. 253, 263, 25 S.Ct. 644, 646, 49 L.Ed. 1040 (1905) (The re-

quirements of a judicial trial do not prevail in every case. The decision to deny entrance to an alien may be entrusted to an executive officer and his decision is due process); accord Knauff v. Shaughnessy, 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950) (whatever the procedure authorized by Congress is, it is due process as far as the alien denied entry is concerned.) But see Ng Fung Ho v. White, 259 U.S. 276, 282, 42 S.Ct. 492, 494, 66 L.Ed. 938 (1922); Chlomos v. INS, 516 F.2d 310 (3rd Cir. 1975); Navia-Duran v. INS, 568 F.2d 803 (1st Cir. 1977); Garcia-Jaramillo v. INS, 604 F.2d 1236 (9th Cir. 1979) (In a deportation hearing an alien is entitled to the guarantee of due process which is satisfied only by a full and fair hearing); Garica v. Smith, 674 F.2d 838, 841 n.3 (11th Cir. 1982) citing Leng May Ma v. Barber, 357 U.S. 185, 187–188, 78 S.Ct. 1072, 1073–74, 2 L.Ed.2d 1246 (1958).

9. 8 U.S.C. §§ 1226, 1252.

ing them a right to an exclusion hearing.[10] An exclusion hearing is a quasi-judicial proceeding that is held before an immigration judge. While the hearing is not subject to all of the protections of due process, it must be fair and in accordance with the statutes and regulations.[11] If the alien loses at the exclusion hearing, the statute provides that he may seek review of that decision in the Board of Immigration Appeals (BIA).[12] If this appeal is unsuccessful and a final order of exclusion is entered against the alien, that order may be reviewed by filing a petition for a writ of habeas corpus in the federal district court.[13] The district court's decision can be appealed to the United States Circuit Court of Appeals and ultimately the alien may seek review by certiorari in the United States Supreme Court.[14]

The practical effect of trial and appellate rights for excludable aliens is that if he is apprehended, an alien determined to stay here who retains a skilled immigration lawyer may prolong his departure from this country for years.[15]

## A. BACKGROUND

The ineffectiveness of our immigration system is vividly reflected by the present conditions in South Florida. The migration of undocumented Haitians to South Florida began in December 1972. By the beginning of 1981, an estimated thirty-five thousand undocumented Haitians were already present in this region. Yet, throughout this time, INS has failed to develop a comprehensive policy to deal with the situation.

During this period of time, INS entered into an agreement with the National Council of Churches providing that Haitians who arrived in South Florida by boat other than a certified carrier were to be detained only a brief period of time for medical screening and were routinely released to available sponsors and given work authorizations.[16] The release of Haitians lasted until the Spring of 1981.[17]

In early April 1980 some 10,000 Cubans sought sanctuary in the Peruvian Embassy in Havana, Cuba. Within a few days thereafter, boats began to leave South Florida for Cuba's Mariel Harbor, in order to bring Cubans to the United States. Thus began the Mariel Boatlift or Freedom Flotilla during which some 125,000 Cubans were brought to the United States in the Spring of 1980.

The boatlift, and the Government's inability to control it, were natural and foreseeable consequences of this country's lack of a comprehensive immigration policy. Once the "Freedom Flotilla" started, noth-

---

10. 8 U.S.C. § 1226.

11. *Garcia v. Smith*, 674 F.2d 838, 841 n.3 (11th Cir. 1982).

12. 8 U.S.C. § 1226(b) provides in part "From a decision of a special inquiry officer an alien may take a timely appeal to the Attorney General and any such alien shall be advised of his right to take such an appeal." The Attorney General has delegated his authority to hear appeals from decisions of special inquiry officers to the BIA. *See* 8 C.F.R. § 3.1(b)(1).

13. 8 U.S.C. § 1105a(b).

14. The lengthy administrative and judicial proceedings involved in resolving an alien's claim for admission raises serious questions regarding the validity of detaining aliens, pending resolution of their claims, without some sort of a due process hearing. The argument in favor of a hearing is particularly compelling when the essence of the alien's claim for admission is based on a fear of persecution upon return to his homeland. Thus, the "choice" to voluntarily withdraw an application for admission and thereby be released from detention may not be a meaningful choice. Indeed, the Plaintiffs' failure to elect this alternative indicates that detention in the United States is the lesser of two evils.

15. *See* 8 U.S.C. § 1255 regarding discretionary relief from deportation.

16. Joint Pretrial Stipulation, docket no. 336, filed March 2, 1982, Par. 5(1)–(4).

17. The number of Haitians apprehended during this period indicates a trend of increased migration to the shores of South Florida. The logical inference to be drawn from this data is that the policy of parole in conjunction with work authorization "provided the greatest inducement to the ultimate swollen tide of incoming undocumented Haitians." *Haitian Refugee Center, Inc. v. Smith*, 676 F.2d 1023 at 1029 n.11 (11th Cir. 1982).

ing could be done except to allow the Cubans to arrive and then formulate, on a post hoc basis, a plan to process and resettle them. When the plan was developed, it also took into account the Haitians who had entered the United States during this period. The Carter Administration established a "Cuban/Haitian" entrant status for all Cubans who arrived in the United States between April 21 and June 20, 1980, and for all Haitians who arrived prior to June 20.

The Carter Administration's plan did no more than assign an immigration status to these aliens and assist in the efforts to resettle them. The local communities were left with the task of providing jobs, housing, health care and food for the approximately 150,000 new residents of South Florida. This burden taxed local resources to their limits and continues to do so.

## B. POLICY CHANGE

In February 1981, the Select Committee on Immigration that was appointed by the Carter Administration issued a report that concluded what this community was already painfully aware of: an immigration crisis exists in this country. As a result, President Reagan, in March 1981, convened a special task force to consider the continuing problem of illegal immigration into the United States. The Attorney General presided over the task force which consisted of the cabinet officers in charge of the Departments of State, Defense, Transportation, Labor, Commerce, Health and Human Services and the Director of the Office of Management and Budget.

The task force recognized the tremendous problems created by illegal immigration, particularly at a time of inflation and unemployment, and noted that the public "[c]oncern has been heightened by the mass influx of Cubans and Haitians into South Florida and the continuing arrivals of refugees from other parts of the globe." Materials were submitted to the task force demonstrating that there were anywhere between three to six million people, possibly more, here illegally and that we had developed an underground society in America.

Because these people constantly lived in fear of being deported, they were particularly vulnerable to unfair labor practices, as well as other forms of economic intimidation. In addition, the task force found that illegal aliens became associated with criminal acts and even when they were not participants, they would not come forward as either victims or witnesses of crimes.

The task force attempted to develop comprehensive solutions to deal with these and other problems resulting from continuing illegal immigration and the presence in American society of large numbers of illegal aliens. The policy proposals that came out of the task force can best be described by dividing them into two categories. The first proposal was designed to deal with those illegal aliens already present in the United States. Rather than waste the resources that would be necessary to apprehend, bring deportation proceedings and possibly expel these people, the task force recommended to the President that there be an amnesty program to legalize the status of the illegal alien population. Having made this decision, a second group of proposals dealing with aliens unlawfully coming to the United States was necessary.

The task force was concerned that an amnesty program, particularly on so large a scale, would encourage even more illegal immigration by persons seeking to obtain the benefits thereof. Accordingly, the task force also recommended increased efforts to enforce the immigration laws as written and proposed new legislation designed to correct problem areas in the existing legislation. One of the major new policies that was recommended and adopted were sanctions against employers who employ illegal aliens. This was designed to remove one of the motivations to come here illegally. Another proposal was to amend the criminal laws so that it clearly became a crime to bring aliens illegally into the country regardless of whether it is done surreptitiously or openly as it was done during the Mariel Boatlift. Such a statute would hopefully deter another Mariel. It was also recommended that there be a return to a

policy of detaining aliens until they can establish to INS' satisfaction a prima facie claim for admission to this country.[18]

The President approved the recommendations of the Task Force with respect to an amnesty proposal and increased enforcement efforts, including detention.[19] In addition, he approved a limited proposal to interdict the flow of illegal immigration from the Caribbean.

Thereafter, on July 30, 1981, the President issued a statement on the immigration policy of this nation. That statement noted that "[i]mmigration and refugee policy is an important part of our past and fundamental to our national interest." Moreover, the statement emphasized the need to "establish control over immigration" and pointed out that the Attorney General was taking administrative actions as well as submitting proposed legislation designed to guarantee that foreigners were admitted to the United States "in a controlled and orderly fashion . . ."[20]

That same day the Attorney General appeared before a joint session of the Senate Subcommittee on Immigration and Refugee Policy and the House Subcommittee on Immigration and Refugee Policy and the House Subcommittee on Immigration, Refugees and International Law. The Attorney General advised Congress that "we have lost control of our borders. We have pursued unrealistic policies. We have failed to enforce our laws effectively." In that connection, the Attorney General noted that the Government's attempt to screen and process those seeking entry into the United States has simply "crumbled under the burden of overwhelming numbers." As part of the overall plan to regain control over the borders, the Attorney General emphasized the "necessity of detaining illegal aliens pending exclusion."[21]

Part of the new immigration program approved by the President called for more restrictive use of parole and increased use of detention. However, the Task Force's proposal in this area, and the statute on which they relied, did not indicate to those who had to administer the new policy which excludable aliens were to be detained. Justice Department and INS personnel were given the responsibility to develop the specific aspects of this plan.

---

**18.** Detention is not a new concept in the field of immigration law. During the late 1940's and early 1950's it was a routine practice. However, in 1954, when the Ellis Island detention facility was closed, the policy was established that aliens seeking admission into the United States should not be placed in physical incarceration unless they were a security risk or likely to abscond. This policy was never formally promulgated.

Under the policy adopted in 1954, at least 95% of aliens whose admissibility was questioned were not subject to detention. Since then, hundreds of thousands of aliens have been released including a large number of aliens whose admissibility was questioned. Aliens making political asylum claims were generally granted deferred inspection, a form of parole, while their claims were processed. These aliens need not have documents. *See Pierre v. United States*, 547 F.2d 1281, 1283 (5th Cir. 1977), *vacated and remanded*, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977). The parole practice never distinguished between persons who were documented or undocumented or whose documentation was challenged.

**19.** On June 26, 1981, the Attorney General sent a memorandum with attached decision packets to the President of the United States. One of the packets was designated as the "Cuban/Hai-

tian Problem". Under that heading in the attached paper, Option 1 ["Status Quo"] was not recommended by any of the advisors, Option 2 ["Limited Interdiction plus Status Quo Non-detention"] was recommended only by the Department of Transportation and Frank Hodsol, and Option 3, ["Interdiction and Detention"] was recommended by the Department of State, Justice, Treasury, Labor and HHS. This option, which ultimately was the policy announced by the Reagan Administration was analyzed as follows:

"Detention could deter continuing illegal immigration reducing adverse community impact . . . But detention risks camp overflowing because of procedural delays . . . Detention could create an appearance of 'concentration camps' filled largely by blacks."

Plaintiffs' Exhibit 4 at page 8.

Thus, it is apparent that detention was approved in spite of the potentially adverse effects of the appearance of discrimination. The evidence in this regard does not support Plaintiffs' position that the Administration acted with a discriminatory purpose or motive.

**20.** Plaintiffs' Exhibit 31

**21.** *Id.*

The people in charge of drafting the detention guidelines were cognizant of the fact that the new policy was not applicable to all excludable aliens. INS never intended to physically incarcerate persons who complied with the prescribed procedures for admission but were excludable on minor, technical grounds such as a clerical error on their visa. The policy was designed to deal with another Mariel type situation, regardless of the nationality or number of the arriving aliens. Therefore, the guidelines for detention had to reflect the perceived characteristics such a group of aliens would have. The problem was isolating these characteristics and incorporating them into guidelines that were capable of being objectively applied in individual cases.

The President did not specify whether the development of specific detention and parole criteria was to be accomplished internally by INS or through a rulemaking procedure in which the public could participate. *INS elected to do neither.* They admitted to the Court that they made a conscious decision not to promulgate a rule pursuant to the Administrative Procedure Act. The evidence shows that they never seriously undertook the difficult task of drafting a set of guidelines concerning which aliens would be placed in detention. Instead, INS issued general instructions to its field officers to start detaining excludable aliens who do not establish a prima facie claim for admission.

Defendants can point to no operating instruction, internal memorandum or other document that completely reflects the official detention policy. Consequently, the Court cannot precisely define the criteria for detention any better than the Government's witnesses articulated them.[22] However, the general theme that emerges from the evidence is that aliens are to be detained unless and until they establish to INS' satisfaction a prima facie claim for admission.[23] Within this framework, the District Director had no discretion to grant deferred inspection to Haitians arriving aboard non-signatory carriers without first placing them in detention.

## C. THE CLASS—THE EVIDENCE

The evidence shows that prior to May 20, 1981, Haitian refugees arriving in this country, for whom the INS initiated exclusion proceedings, were detained for a brief period of time necessary for routine public health screening and released on parole into the community to relatives or voluntary agencies willing to act as sponsors. This "policy" abruptly changed sometime between May 20, 1981 and July 31, 1981; and a policy of detention was initiated.

Notwithstanding the fact that there are no clear guidelines for who should be detained and who should be paroled, INS has continued to enforce the new policy.[24] As

---

22. Plaintiffs' Exhibit 71C (Declaration of Alan Nelson); Transcript at 2180, 2269–70; deposition of Doris Meissner, Sept. 1, 1981, at p. 5–8. No two explanations were alike.

23. In referring to "criteria for detention" the Court means those factors that would be considered by the immigration inspector in determining whether an excludable alien should be given a deferred inspection or placed in detention. Parole criteria are factors to be considered in determining whether an alien in detention should be released.

24. The Court believes that the inconsistencies between what the Government witnesses said the policy was and the policy their subordinates were carrying out can be attributed to the absence of guidelines for detention and parole. For example, the evidence shows that the failure to define who is a minor and what efforts

should be made to reunify families sometimes had cruel results.

MR. ROSEN:
Q Joel, would you state your name, please.
A Joel Girardin.
Q Joel, how old are you?
A Fifteen.
Q When did you first arrive in this country?
A On October 12th, 1981.
Q And were you arrested immediately upon entering this country?
A Yes.
Q Where were you taken, Joel?
A To Krome.
Q Have you been at Krome ever since October 12th?
A Yes.
Q Joel, do you have any family here?
A Yes.
Q Who?
A I have my aunt here and my cousin.

of the date of this Order, pursuant to this policy, some class members have been in detention for over 11 months awaiting a determination on their claims for admission. The Court heard testimony that some non-Haitians in exclusion proceedings were not detained even though they arrived after the effective date of the new policy. Most of the testimony in this regard was general but some specific examples were given. While it appeared some of these individuals were clearly excludable, the evidence was insufficient to establish that they had similar immigration status but were treated differently than Plaintiffs.

In addition to the testimony regarding disparate treatment, both parties introduced documentary evidence on the number of Haitians versus non-Haitians being detained and paroled. The evidence shows that both Haitians and non-Haitians are being detained, but that more Haitians are being detained and for longer periods of time than non-Haitians. The evidence also demonstrates that a larger percentage of non-Haitians are granted parole or deferred inspection than the percentage of Haitians. Plaintiffs' expert statistician interpreted this data to mean there is a statistically significant relationship between being detained and being Haitian. The Court does not quarrel with this conclusion but believes that it does not deserve much weight in determining the merits of Plaintiffs' discrimination claim.

Parole is not a random process and the probability of parole is not the same for every person. The decision to grant a deferred inspection takes into account many factors not contained in the data analyzed by Plaintiffs' statistician. Factors that may be considered include the age and health of the alien as well as the reason he does not appear entitled to enter this country. Other factors include being accompanied by a minor and pendency of an I–130 application. These factors, with the exception of documentation, were not separately analyzed by Plaintiffs' expert. With regard to his analysis of the significance of possessing documents it was far too simplistic because it did not distinguish between the types of documents possessed and the facial validity thereof. The evidence before the Court simply did not establish the existence of a statistically significant relationship between being detained and being Haitian in the context of similarly situated individuals. The only conclusion that can be drawn from this evidence is that Haitians are being impacted by the detention

Q Where does your aunt live?
A Miami.
Q Do you have any family in Krome, Joel?
A Yes, a brother of mine.
Q How old is he?
A Twenty-three.
Q Joel, are you able to stay with your brother in Krome?
A No. They don't put me in the same place as he.
Q Do you know why?
A No.
BY MR. KURZBAN:
Q Can you state your full name for the record please?
A Hendrick DeSulme.
Q Mr. DeSulme, when did you come to the United States?
A August 9, 1981.
Q Did you come here alone or were you accompanied by anyone?
A Accompanied by my cousin and my child.
Q How old is your child?
A Two.
Q Boy or girl?
A A boy.

Q When you said before they asked you who should take care of whether or not your child could go with your cousin?
A Yes.
Q Your cousin was in the camp at the time?
A Yes. She was on the female side.
Q They did not release your son at that time?
A Never.
Q How long was your son at Krome?
A A month and a half.
Q When your son was released, did you ask to be released also?
A They had transferred me to Otisville. They had kept my child and released him after I left.
Q Did you tell immigration anything with respect to whether or not you wished to be transferred because your son was at Krome?
A When I was being transferred I called Mr. Garcia and I told Mr. Garcia, my child is my own child. He has lost his mother. I am his mother and his father both. That means that wherever I go is where he should be. He told me, "shut up."

policy to a greater degree than aliens of any other nationality at the present time.

Detention was not and is not intended to be an end in itself. It was proposed and adopted as an integral part of an overall revision of our immigration policy. At or about the time detention began, other changes in the exclusion procedure were being implemented. These changes included (1) immediate service on the alien of a notice to appear for an exclusion hearing (I–122), (2) interviews with the alien prior to the hearing to determine the nature of his claim for admission and (3) mass exclusion hearings. In response to these changes in the hearing procedure, this lawsuit was instituted.[25] On September 30, 1981 *nunc pro tunc* September 9, 1981, Judge Hastings entered a Temporary Restraining Order, later converted into a preliminary injunction, that prohibited the Defendants from holding exclusion hearings for class members.[26] That Order did not address the issue of the propriety of Plaintiffs' detention.

In the summer of 1981, the Krome detention facility became severely overcrowded. This condition resulted from a combination of factors including HRC's assumption of legal responsibility for representing over 500 Haitians detained at Krome, the filing of this lawsuit and subsequent injunction of exclusion proceedings by Judge Hastings and the continuous flow of Haitians into South Florida.

In July 1981, the State of Florida instituted suit against the Federal Government because of the overcrowding at Krome. In the course of the litigation, the Government represented that efforts would be made to keep the population at Krome at or under 1000 persons. In order to abide by this representation to the Court, the Government had to start transferring Haitians out of Krome whenever the population exceeded 1000.

As space became available in July 1981, the Government transferred Haitians from Krome to other INS detention locations, including Fort Allen, Puerto Rico; Brooklyn, New York, and to facilities made available by the Bureau of Prisons in places such as Otisville and Raybrook, New York; Latuna and Big Springs, Texas; Lexington, Kentucky; Morgantown and Alderson, West Virginia.[27] Pursuant to the new de-

**25.** The Complaint originally contained seven counts that challenged a broad range of policies and practices utilized by INS during exclusion proceedings. In a prior Order, this Court held that Section 106 of the Immigration and Nationality Act (hereinafter ("INA"), 8 U.S.C. § 1105a, precluded judicial review of four entire counts and portions of two other counts. That ruling was based on the Court's finding that Congress intended the procedure set forth in Section 1105a to wit, habeas corpus, to be the sole and exclusive means to challenge determinations made during the incident to exclusion proceedings. In addition, the Court found that habeas corpus was available to challenge those determinations only after a final order of exclusion had been entered and all available administrative remedies were exhausted. *See Louis v. Meissner*, 532 F.Supp. 881 (S.D.Fla. 1982).

Two issues, set forth in three counts, survived the Court's Order of Dismissal. The first issue, and the question of primary importance to these class members, is whether they are lawfully being detained pending the outcome of their exclusion proceedings. The second issue is whether persons in detention have a right of access to persons on the outside, and vice versa.

In light of the dismissal the Court intimates no view on the propriety of the putatively illegal practices. Testimony in this regard was admitted solely for the purpose of establishing discrimination in that these practices allegedly departed from normal exclusion procedures and were applied solely to Haitians. While the Court believes these practices to be a departure from the normal procedure, it does not find that they were applied solely to Haitians or that the Defendants implemented these practices with any intent to discriminate against Plaintiffs due to their race and/or national origin.

**26.** *Louis v. Meissner*, 530 F.Supp. 924, 926 (S.D.Fla.1981).

**27.** The Court finds that the transfer of Haitians to these areas was necessary in order to comply with the Government's representations in the suit brought by the State of Florida regarding the population at the Krome detention facility. *Graham v. Smith*, Case No. 81–1497–CIV–JE (S.D.Fla.). *See* Defendants' Exhibit C. The evidence does not support Plaintiffs' contention that these transfers were intended to deny Plaintiffs' access to counsel and to punish or otherwise discriminate against Plaintiffs.

tention policy, approximately 2100 individual Plaintiffs continue to be incarcerated in these various detention facilities.

## D. THE CLASS—PLAINTIFFS' CLAIMS

The Plaintiffs herein are the Haitian Refugee Center, Inc., Lucien Louis, Wilner Luberisse, Jean Louis Servebien, Pierre Silien, Serge Verdieu, Milfort Vilgard, Joel Casimir, Job Dessin and Prophete Talleyvand, on behalf of themselves and all others similarly situated.[28] The class certified by the Court consists of:

> All Haitian aliens who have arrived in the Southern District of Florida on or after May 20, 1981, who are applying for entry into the United States and also are presently in detention pending exclusion proceedings at various INS detention facilities, for whom an order of exclusion has not been entered and who are either:
>
> 1) Unrepresented by counsel;
>
> or
>
> 2) Represented by counsel pro bono publico assigned by the Haitian Refugee Volunteer Lawyer Task Force of the Dade County Bar Association.

Plaintiffs have advanced a two-prong attack on the Government's new detention policy. They argue first that before the policy was instituted, they were entitled, under the provisions of the Administrative Procedure Act (hereinafter "APA"), to no-

tice and an opportunity to comment. *See* 5 U.S.C. § 553. INS' failure to follow this procedure, they claim, requires this Court to find their detention to be unlawful. Second, Plaintiffs contend that the detention policy is discriminatory on its face in that only Haitians fall within its purview. In the alternative, if the policy is construed to apply to all excludable aliens, Plaintiffs claim it is being applied unequally to their detriment. Thus, the essence of their second argument is that the detention policy is illegal because it is discriminatory on its face and/or in its application. Plaintiffs claim such discrimination violates the Equal Protection guarantees of the Fifth Amendment to the United States Constitution as well as the provisions of Articles 3 and 31 of the United Nations Convention and Protocol Relating to the Status of Refugees, to which the United States is a signator. *See* 19 UST 6260 T.I.A.S. No. 6577 (the "Convention"); 19 UST 6223, T.I.A.S. No. 6557 (the "Protocol").

## E. JUSTICIABILITY

Prior to contesting the merits of the claims before the Court, Defendants raised three issues of justiciability: exhaustion of administrative remedies, the political question doctrine and standing. Some of these issues have been partially addressed in a prior Order of the Court but apparently they have not been put to rest.[29] Because

---

However, the evidence does indicate that no effort was made by INS to determine whether the Haitians being transferred were represented by counsel in Miami, or had relatives in Miami (in or out of detention). Notice of the transfers, and the purpose and method thereof, was not given to the Haitians in order to allow them to notify their family and to alleviate any fears they may have had that they were being sent back to Haiti. Moreover, once the Haitians arrived at their respective destinations, they were not given access to telephones so they could contact their families and friends. Thus, the transfers were necessary but the manner in which they were carried out left much to be desired. *See Order Granting in Part and Denying in Part Defendants' Motion for Permission to Transfer Class Members,* docket no. 385, dated March 26, 1982.

**28.** Plaintiff, Haitian Refugee Center, Inc. (hereinafter HRC) is a not-for-profit corporation organized under the laws of the State of Florida on September 17, 1980. The stated purposes of HRC are to "promote the well-being of Haitian Refugees through appropriate programs and activities" including but not limited to legal representation. The by-laws of HRC were approved on February 27, 1981, and provide that HRC's membership consists of "the Haitian Refugee Community in Florida and members of the community at large who have shown support and interest for the defined purposes and activities of the corporation". Defendants' Exhibits D and E.

Plaintiffs, Lucien Louis, Wilner Luberisse and Job Dessin have been paroled by INS.

**29.** The Court's Order of Dismissal, note 25, *supra,* only dealt with the question of whether 8 U.S.C. § 1105a barred the Court from exer-

these challenges go to the heart of the Court's power to adjudicate the case before it, the Court will take this opportunity to set forth its reasons for exercising jurisdiction.

## 1. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants contend that this lawsuit is an improper attempt to procure the release *en masse* of detained Haitians even though they have made no showing that some or all of the aliens have requested parole and parole has been denied. Until Plaintiffs request the District Director to exercise his discretion to parole them, Defendants believe judicial intervention is inappropriate.

Plaintiffs have countered this argument by introducing evidence that some, if not all, of the class members have requested parole. The evidence consists of written requests for parole made on behalf of Haitians in detention by relatives, the Haitian Refugee Center, Inc., privately retained attorneys, pro bono attorneys, and religious and charitable organizations. There is also testimony that class members regularly make oral requests for release to the INS officials at the various detention facilities.[30] Plaintiffs argue that the Court should take jurisdiction over their claims even if the evidence does not support a finding that all class members requested parole because their claims fall within certain exceptions to the exhaustion rule and a balancing of equi-

ties mandates judicial intervention at this time.

■ A party will normally be denied judicial relief until the administrative remedies available to him have been exhausted. By refusing to interrupt the administrative process, several policies are advanced: (1) a more complete record is developed; (2) the agency is allowed to exercise its discretion or expertise; (3) the agency is allowed to correct its own errors and (4) the agency is not weakened by easy circumvention of its procedures. *See generally Federal Power Commission v. Metropolitan Edison Co.*, 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408 (1938); *Meyers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 52 S.Ct. 459, 82 L.Ed. 638 (1938); *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

■ However, the exhaustion doctrine should not be rigidly applied. It is a flexible concept that must be tailored to the administrative statutes and circumstances peculiar to the case. Thus, the failure of one or more of the Plaintiffs to exhaust his administrative remedies does not automatically preclude the Court from hearing their claims.[31] That decision must be based on a balancing test that employs the policy factors favoring exhaustion and the circumstances peculiar to Plaintiffs' case that favor judicial review. *See Ecology Center of Louisiana Inc. v. Coleman*, 515 F.2d 860 (5th Cir. 1975).

cising jurisdiction over Plaintiffs' claims. It was not intended to be dispositive of all Defendants' jurisdictional and sufficiency challenges to the complaint. Although the Court addressed the exhaustion and standing issues in that Order, it did so solely in the context of the claims dismissed and did not specifically deny Defendants objections to Plaintiffs' APA and discrimination claims.

**30.** The Court finds that all of the Plaintiff class members did not request parole. However, the Court believes INS had constructive and/or actual knowledge that Plaintiffs wanted to be released.

Moreover, it is significant to note that the administrative procedure for seeking parole does not require an application to be filed, a hearing to be held or a record to be made. *See* 8 U.S.C. § 1182(d)(5); 8 C.F.R. § 212.5; INS O.I. 212.-5a. Thus, an excludable alien may be paroled,

or granted a deferred inspection by the examining immigration officer at the airport or seaport without ever asking for parole. The District Director's decision to grant or deny parole is not reviewable by the BIA and appears to be a final order thereby reviewable in this Court. *See* 8 C.F.R. § 3.1(b); *Pierre v. United States*, 547 F.2d 1281, 1284–86 (5th Cir. 1977); *Ahrens v. Rojas*, 292 F.2d 406, 410 (5th Cir. 1961).

**31.** Exhaustion is not a jurisdictional prerequisite to review. Whether exhaustion should be required is a matter committed to the sound discretion of the trial court. *NLRB v. Industrial Union of Marine and Shipbuilding Workers*, 391 U.S. 418, 419, 426 n.8, 88 S.Ct. 1717, 1719, 1722 n.8, 20 L.Ed.2d 706 (1968); *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 865–66 (5th Cir. 1975).

Continuous use of the balancing test has resulted in the judiciary's development of several exceptions to the exhaustion rule. In *Patsy v. Florida International University*, 634 F.2d 900 (5th Cir. 1981) the Fifth Circuit, sitting *en banc*, stated:

Briefly the traditional exceptions are *first*, exhaustion is not required when the prescribed administrative remedy is plainly inadequate because either no remedy is available, the available remedy will not give relief commensurate with the claim, or the remedy would be so unreasonably delayed as to create a serious risk of irreparable injury. *Walker v. Southern Railway*, 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294 (1966); *Frozen Food Express v. United States*, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956); *United States v. Joseph A. Holpuch Co.*, 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946); *United States Alkali Export Association v. United States*, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945): 3 K. Davis, Administrative Law § 20.07 (1958 and Supp.1970, 1976 & 1978).

*Second*, when the claimant seeks to have a legislative act declared unconstitutional and administrative action will leave standing the constitutional question, exhaustion is not required. *Public Utilities Commission v. United States*, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); Davis, *supra*, at § 20.04.

*Third*, courts do not require exhaustion when the question of the adequacy of the administrative remedy is for all practical purposes co-extensive with the merits of the plaintiff's claim, such as when, for example, the plaintiff contends that the administrative system itself is unlawful or unconstitutional in form or application. *Fuentes v. Roher*, 519 F.2d 379 (2d Cir.

1975); *Finnerty v. Cowen*, 508 F.2d 979, 982–83 (2d Cir. 1974).

*Fourth*, exhaustion of administrative remedies is not required if it would be futile to comply with the administrative procedures because it is clear that the claim will be rejected. *City Bank Farmers Trust Co. v. Schnader*, 291 U.S. 24, 54 S.Ct. 259, 78 L.Ed. 628 (1934); *Montana National Bank v. Yellowstone County*, 276 U.S. 499, 48 S.Ct. 331, 72 L.Ed. 673 (1928).

634 F.2d at 903–04.

■ In the case at bar, the Court believes that the third and fourth exceptions to the exhaustion rule make Plaintiffs' claim justiciable. The administrative remedy available is co-extensive with Plaintiffs' claim in that the form and application of the remedy is under attack on statutory and constitutional grounds. Clearly, INS has no power to adjudicate the legality of its own policy under the provisions of the APA and the agency is similarly incapable of resolving the challenges to the manner in which the policy is applied. Moreover, its incapacity in this regard leads the Court to conclude that further attempts for administrative relief would be futile. The Court can see no rational purpose for requiring these class members to seek relief from the INS, since the law never requires one to do a useless act; here such a request would, with few exceptions, fall on deaf ears.

Nor does the Court feel that the policy factors favoring exhaustion will be advanced by requiring these Plaintiffs to request parole at this time.[32] First, the record before the Court is satisfactory in that it establishes the current criteria for release on parole. Individual administrative records are not necessary because the Court is

**32.** On June 14, 1982, the Attorney General announced a plan for the release of Haitians currently in detention, some of whom are class members. That announcement was made subsequent to the Court's decision in this case but prior to the issuance of this opinion. It is the view of the Court that the planned release in no way moots the issues herein and that it must be disregarded to the extent it might appear to bear upon the issue of discrimination.

INS' implementation of the Attorney General's parole plan does not affect the Court's analysis of the exhaustion issue. Because the Court is not reviewing individual parole decisions, further development of the administrative record would not materially aid the Court in making its decision as to whether the detention policy is unlawful.

not being asked to review individual parole decisions. The issue before the Court is legal, not factual, and further development of the administrative record would not significantly aid judicial review.[33] Second, allowing the agency to exercise its discretion would accomplish nothing if, as Plaintiffs allege, the District Directors either have no discretion to parole them, or use unlawfully adopted criteria for release when exercising their discretion.[34]

Finally, the Court is of the view that additional requests for parole will not result in a decision to change or correct this allegedly unlawful policy. Without a judicial determination that Plaintiffs' detention is unlawful, it appears that many of them will remain in custody and under these circumstances, allowing them to challenge their detention will not weaken the established administrative mechanism to attain release on parole.

Thus, after balancing the harshness of requiring exhaustion and the apparent inability of INS to provide relief against the factors favoring exhaustion, the Court finds that a dismissal on this ground is unwarranted. *Ecology Center of Louisiana v. Coleman*, 515 F.2d 860 (5th Cir. 1975).

## 2. THE POLITICAL QUESTION DOCTRINE

■ The essence of Defendants' second challenge to the justiciable nature of this lawsuit is that:

[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune

from judicial inquiry or interference. (Citations omitted).

*Mathews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). Parole of Haitians, Defendants contend, raises political questions over which this Court does not have jurisdiction.

It is inconceivable that the decision whether to detain or parole these class members would have a significant impact on the manner in which this country conducts its foreign policy. Assuming *arguendo* that the decision to detain excludable aliens is "intricately interwoven" with our foreign policy, the political question doctrine is inapplicable. The Court has not been called upon to determine the propriety of the detention policy and it intimates no view on the wisdom of the Administration's decision in this regard. Plaintiffs are asking the Court to decide whether their statutory and constitutional rights are being violated. To ensure that individuals are not injured by unlawful action in the immigration and naturalization context, courts rarely apply the political question doctrine when such challenges are brought. As one treatise notes:

Finally, the pervasive influence of the political question doctrine on fields touching on foreign affairs has not led courts to surrender their power to protect individuals against government action. To the contrary, individual rights are protected carefully, although within a framework that takes account of the broad substantive powers of the other branches. *Harisiades v. Shaughnessy*, [342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ] provides a much-invoked illustration. Ultimately the Court upheld the

---

**33.** The APA claim is strictly a legal issue and probably could have been resolved by summary judgment based on the parties' pretrial stipulation. Plaintiffs' discrimination claim is both factual and legal in nature. Whether the policy is discriminatory on its face is factual in that the parties do not agree on what the policy is. Whether the policy is being applied in a discriminatory fashion is also disputed. Notwithstanding the existence of these issues of fact, the court's decision would not have been aided

by further development of the administrative record because the Court dismissed that portion of the complaint that individual parole and asylum claims were denied on discriminatory grounds. *See Louis v. Meissner*, 532 F.Supp. 881 (S.D.Fla.1982).

**34.** The Court does not believe INS has any particular expertise in deciding which aliens are good candidates for parole.

challenged deportation order, and it spoke tenderly of the threads weaving policy toward aliens into the pattern of political judgments dealing with foreign affairs. But it decided on the merits challenges based on due process, the First Amendment, and the ex post facto clause. Respect for the political branches affects, but does not preclude, decision on the merits.

13 Wright & Miller, Federal Practice and Procedure § 3534 at 314 (1976). (Footnotes omitted). For these reasons, the Court believes this case is justiciable notwithstanding the Supreme Court's admonition in *Mathews v. Diaz, supra.*

### 3. STANDING

The "three-part test [for standing to contest the validity of agency actions] established in *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) and *Association of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) . . . is: (1) the challenged action must result in injury-in-fact to the plaintiffs; (2) the interest invaded must be arguably within the zone of interest to be protected by the statute; and (3) there must be no statutory prohibitive of judicial services." *Suntex Dairy v. Bergland,* 591 F.2d 1063, 1066 (5th Cir. 1979).

▬ The injury-in-fact element of the standing test requires Plaintiffs to demonstrate a sufficiently direct and concrete injury. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), which is likely to be readdressed if Plaintiffs prevail on the merits. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 262, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Kentucky Welfare Rights Organization,*

426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The Plaintiff class members in the case *sub judice* have met this constitutional requisite for standing; their injury-in-fact consists of their continued, allegedly illegal, incarceration pending resolution of their political asylum claims.[35]

The second element of the standing test is mandated by the APA. A person who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof" under Section 10(a) of the APA. 5 U.S.C. § 702. A plaintiff satisfies the APA's standing requirement if his interests are arguably within the zone of interests that the statute in question was intended to protect or regulate. *Association of Data Processing Service Organization, Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The "relevant statute" is the agency's enabling act or other legislation under which the zone of interests is purported to exist. 5 B. Mezines, J. Stein & J. Gruff, Administrative Law § 50.03, at 50–25 (1980).

The Court believes that the "relevant statute" in the case at bar is Section 212(d)(5) of the Immigration and Naturalization Act, 8 U.S.C. § 1182(d)(5); the statute which the agency's new policy authoritatively interprets.[36] *State of Florida v. Weinberger,* 492 F.2d 488, 494 (5th Cir. 1974). Although the statute speaks in terms of parole "for emergent reasons or for reasons deemed strictly in the public interest", parole has been characterized by the Supreme Court as a "device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958). Viewed from the latter perspective, the interests Plaintiffs seek to advance, to

---

**35.** The Court believes that injury-in-fact is sufficient to confer standing on Plaintiffs. However, the Fifth Circuit apparently takes the position that injury alone is insufficient and, therefore, the Court will address the other aspects of the standing doctrine. *See Environmental Defense Fund, Inc. v. Hardin,* 428 F.2d 1093 (D.C.Cir.1970) (Bazelon, C. J.).

**36.** Plaintiffs' standing to invoke Constitutional Protection is discussed in Section H1, *infra.* The Court notes, in light of that conclusion that Plaintiffs' claims fall within the zone of interest protected by the Constitution.

wit, freedom pending resolution of their asylum claims, are arguably within the zone of interests sought to be protected by Section 212(d)(5) of the Immigration & Naturalization Act.

The final question is whether judicial review of agency action is prohibited. The Court's consideration of this question must of necessity encompass Defendants' claim that decisions regarding parole are not judicially reviewable because release on parole is committed to agency discretion within the meaning of Section 10 of the APA, 5 U.S.C. § 701(a)(2), by 8 U.S.C. § 1182(d)(5)(A).

As a general rule, "a person suffering legal wrong because of agency action or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof." 5 U.S.C. § 702. The general rule applies "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1), (2).

The exception from APA review of agency action "committed to agency discretion" is a very narrow exception. *Save the Bay, Inc. v. Administrator of the E.P.A.*, 556 F.2d 1282, 1293 (5th Cir. 1977). The legislative history of the APA, referred to in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), indicates that the committed to agency discretion exception to judicial review is intended to be "applicable in those *rare* instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' S.Rep.No.752, 79th Cong. 1st Sess. 26 (1945)." *Id.* at 410, 91 S.Ct. at 820. (Emphasis added).

In construing 5 U.S.C. § 701(a) the Supreme Court has stressed the "basic presumption of review." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). The burden of proving nonreviewability is on the agency involved. *See Id. Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *See Morris v. Gressets*, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977); *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Tooahnippah v. Hickel*, 397 U.S. 598, 606, 90 S.Ct. 1316, 1321, 25 L.Ed.2d 600 (1970); *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 155–57, 90 S.Ct. 827, 830–31, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). The reviewing court must determine "whether Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion." *Morris v. Gressette*, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977); *Barlow v. Collins*, 397 U.S. 159, 165, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970).

As no provision of the Immigration and Naturalization Act expressly precludes judicial review of the Attorney General's actions under § 212(d)(5), it is necessary to determine "whether unreviewability can fairly be inferred." [37] 397 U.S. at 166. *See Association of Data Processing Service Organization v. Camp*, 397 U.S. 150, 157, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970); *Switchmen v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); *Morris v. Gressette*, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977). That inquiry requires an evaluation of the legislative scheme as well as the practical and policy implications of judicial review. *Bullard v. Webster*, 623 F.2d 1042, 1046 (5th Cir. 1980), *cert. denied* 451 U.S. 907, 101

---

**37.** The Defendants do not contend that such a provision exists and rely instead on the argument that preclusion of judicial review may be inferred from the statutory scheme. This position is contrary to that taken by the Defendants with regard to INS' policies and practices used during or incident to exclusion proceedings. See Defendants' Memorandum in Support of their Motion to Dismiss, docket no. 114, filed Sept. 30, 1981, at p. 24.

S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Local 2855 v. United States*, 602 F.2d 574, 575 (3rd Cir. 1969).

> There must be a weighing of the need for, and feasibility of, judicial review versus the potential for disruption of the administrative process. *Kletschka v. Driver*, 411 F.2d 436 (2d Cir. 1969). Criteria suggested by the Third Circuit in Local 2855 for making such a determination include (1) the broad discretion given an agency in a particular area of operation, (2) the extent to which the challenged action is the product of political, economic or managerial choices that are inherently not subject to judicial review, and (3) the extent to which the challenged agency action is based on some special knowledge or expertise.

623 F.2d at 1046.

Section 212(d)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5) provides in part "[t]he Attorney General may . . . in his discretion parole into the United States temporarily and under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States . . ." The Attorney General's discretion has been delegated to the District Directors by regulation, see 8 C.F.R. § 212.5, and the District Director has further delegated that authority to his subordinates provided they are not below the level of an officer in charge or an immigrant inspector in charge of a port of entry. *See* INS Operations Instruction 212.5.

■ The fact that the statute by its terms permits rather than compels, agency action does not alone commit that action to the agency's unreviewable discretion. *See Mulloy v. United States*, 398 U.S. 410, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093 (D.C. Cir.1970); cited in *Save the Bay, Inc. v. Administrator of the E.P.A.*, 556 F.2d 1282,

1293 (5th Cir. 1977). Nor can nonreviewability be inferred from the apparently broad discretion given INS in this area of operation. For many years, the statute's language has been construed to mean that aliens seeking admission to the United States should not be placed in physical incarceration unless they were a security risk to the United States or likely to abscond. This interpretation was recognized by the Supreme Court in *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246 (1958) and by INS in its Immigrant Inspector's Handbook. INS' Operations Instruction and the regulations, 8 C.F.R. § 212.5, appear to be consistent with this expansive reading of the parole provision because they give INS officials broad discretion to grant release on parole. Thus, the statute delineates some limits on INS' discretion to parole aliens and thereby provides a standard for courts to decide in particular cases whether there has been an abuse of discretion and application of the criteria require no special knowledge or expertise.

■ The need for judicial review of parole decisions is apparent. Regardless of their status as excludable aliens, Plaintiffs are persons within the territorial jurisdiction of the United States and they cannot be denied their liberty without due process of law. *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976); *Haitian Refugee Center, Inc. v. Smith*, 676 F.2d 1023 (11th Cir. 1982).[38] Judicial review is the only means to insure that aliens seeking parole get the process they are due. An alien's challenge to a denial of parole in no way affects or impedes INS' ability to proceed to determine his admissibility; and, therefore, the Court believes judicial review is feasible without disruption of the administrative process.

After reviewing the statute, regulations and legislative history thereof, the Court has been unable to find "clear and convincing evidence" that Congress intended to cut

---

**38.** See note 14, *infra. Pesikoff v. Sec. of Labor*, 501 F.2d 757, 760 n.3 (D.C.Cir.1974), *cert. denied*, 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974).

off judicial review of parole decisions. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1969). Clearly, the Attorney General's decision involves some degree of discretion of judgment. But it cannot be said that, for this reason, his actions are unreviewable. Moreover, the Court believes that the need for and feasibility of judicial review far outweighs the potential disruption of the administrative process and it finds, therefore, that parole determinations are not committed to agency discretion by law and can be reviewed pursuant to 5 U.S.C. § 702.

Assuming *arguendo* that the substantive decision to parole is committed to agency discretion, judicial review is still available for limited, specific issues subsumed in the decision making process.[39]  *See Ness Investment Corp. v. United States*, 512 F.2d 706 (9th Cir. 1975); *East Oakland Fruitvale Planning Counsel v. Rumsfeld*, 471 F.2d 524 (9th Cir. 1972); *Medical Committee for Human Rights v. SEC*, 432 F.2d 659 (D.C.Cir. 1970), *vacated as moot*, 404 U.S. 403, 92 S.Ct. 557, 30 L.Ed.2d 560 (1972); *Save the Bay, Inc. v. Administrator of E.P.A.*, 556 F.2d 1282 (5th Cir. 1977).

Such partial review serves to protect individuals' interests adversely affected by agency action while imposing only limited, acceptable intrusion upon the administrative process and the dockets of the federal courts. *See Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367 (1968). Along these lines it has been said that "[T]he question is not whether agency action is by law committed to agency discretion but to what extent agency action is so committed." 4 K. Davis, Administrative Law Treatise 33 (1958), quoted in *Medical Committee for Human Rights, Inc. v. SEC, supra*, 432 F.2d at 673 (Emphasis in quote).

556 F.2d at 1293.

The circumstances where judicial review is appropriate, in spite of a finding that agency action is committed to discretion by law, was cogently analyzed by the Ninth Circuit in *Ness Investment Corp. v. United States*, 512 F.2d 706 (9th Cir. 1975). The conclusion reached by the court was:

Where consideration of the language, purpose and history of a statute indicate that action taken thereunder has been committed to agency discretion: (1) a federal court has jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion involves violation by the agency of constitutional, statutory, regulatory or other mandates or restrictions; (2) but a federal court does not have jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion consists only of the making of an informed judgment by the agency.

512 F.2d at 715.

Plaintiffs seek to have the criteria for release declared unlawful because it was adopted in violation of the APA. Thus, the alleged abuse of discretion consists of a statutory violation not an error of judgment. Viewed from this perspective, the Court believes judicial review is permissible.[40]

---

**39.** Admittedly the question of whether individual parole decisions are reviewable pursuant to 5 U.S.C. § 702 is a close one. An equally compelling argument can be made against much review in light of the availability with habeas corpus review. *Rodriguez Fernandez v. Wilkinson*, 654 F.2d 1382, 1390 (10th Cir. 1981); *Palma v. Verdeyen*, 676 F.2d 100 (4th Cir. 1982); *Soroa-Gonzales v. Civiletti*, 515 F.Supp. 1049, 1001 (N.D.Ga.1981).

**40.** *See Pickus v. United States Board of Parole*, 507 F.2d 1107 (D.C.Cir.1974) where under similar circumstances the District of Columbia Circuit held:

We have considered the Board's argument that its promulgation of parole selection criteria is not subject to judicial review—whether or not subject to the Act—because release on parole is committed to agency discretion within the meaning of Section 10 of the Act. 5 U.S.C. § 701(a)(2), by 18 U.S.C. § 4203(a). But we are not reviewing the granting or denying of parole in a particular case, action which may reflect an unreviewable exercise of agency discretion. We are not even reviewing the merits of the rules and standards the Board has adopted. The appellees' complaint and our consequent ad-

In summary, the Court finds that Defendants' challenges to Plaintiffs' standing lack merit. Plaintiffs have met the constitutional requisite for standing in that their continued allegedly illegal incarceration constitutes injury-in-fact. They have met the APA's standing criteria because they fall within the zone of interest of persons that the relevant statute was intended to protect or regulate. Finally, there is no statutory bar to judicial review and the Court cannot find any clear and convincing evidence that Congress intended to commit parole decisions to agency discretion.

## F. SUBJECT MATTER JURISDICTION

[9, 10] United States District Courts are tribunals of limited jurisdiction; their power to hear a case is dependent upon congressional implementation of one of the Constitution's grants of subject matter jurisdiction. Plaintiffs as unadmitted and nonresident aliens occupy a unique position in the law. It is clear that they have no right to enter this country as nonimmigrants or otherwise. *Turner v. Williams*, 194 U.S. 279, 292, 24 S.Ct. 719, 723, 48 L.Ed. 979 (1904); *Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950); *Galvan v. Press*, 347 U.S. 522, 530–32, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954); *Harisiades v. Shaughnessy*, 342 U.S. 580, 592, 72 S.Ct. 512, 520, 96 L.Ed. 586 (1952); *Kliendeinst v. Mandel*, 408 U.S. 753, 762, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972). "Whatever the procedure authorized by Congress is, it is due process as far as the alien denied entry is concerned." 338 U.S. at 544, 70 S.Ct. at 313. The Defendants would have this Court rule that because Congress, when enacting the Immigration and Nationality Act, did not provide for judicial review of denials of requests for parole, federal courts have no jurisdiction to hear Plaintiffs' challenges to their detention.

Under the APA "[A] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. A person may be just as "affected or aggrieved" by agency action if he is an unadmitted alien as he would be if he was admitted. The Supreme Court and the Fifth Circuit have made this clear in their rulings in *Brownell v. We Shung*, 352 U.S. 180, 185, 77 S.Ct. 252, 255, 1 L.Ed.2d 225 (1956) and *Estrada v. Aherns*, 296 F.2d 690 (5th Cir. 1961); *see generally* C. Gordon & H. Rosenfeld, *Immigration Law and Procedure* § 8.8 (1980) (and cases cited therein). Even in cases involving unadmitted aliens, "[e]xceptions from the ... Administrative Procedure Act are not lightly to be presumed, *Marcello v. Bonds*, 349 U.S. 302, 310, 75 S.Ct. 757, 761, 9 L.Ed. 1107 (1955), and unless made by clear language or supersedure the expanded mode of review granted by the Act cannot be modified." 352 U.S. at 185, 77 S.Ct. at 255. Thus, the judicial review provisions of the APA apply to unadmitted aliens unless Congress makes its intent to the contrary clear as it did when it enacted Section 106 of the INA, 8 U.S.C. § 1105a, in response to the *We Shung* case. The mere absence of a provision in the INA for judicial review of parole decisions is not a clear indication that Congress intended to cut off judicial review. The Court finds, therefore, that its jurisdiction was properly invoked pursuant to the Declaratory Judgment Act, 28 U.S.C. 2201, 2202; and Section 10(a) of the Administrative Procedure Act 5 U.S.C. § 702, and 8 U.S.C. § 1329.

The Court also believes that federal question jurisdiction exists pursuant to 28 U.S.C. § 1331. The allegations herein are consistent with the Eleventh Circuit's ruling in *Haitian Refugee Center, Inc. v.*

---

judication address themselves solely to the procedures by which those rules may be formulated. The justiciability of such a complaint depends upon Section 10, particularly subsection (e), of the Act, as already discussed, not the discretionary character of the Board's determinations as to when parole

shall be granted. The giving of notice of rule-making and the consideration of consequent submissions by interested persons might inform, but would not otherwise impinge upon, the Board's discretion in framing its standards and guidelines.
507 F.2d at 1107.

*Smith*, 676 F.2d 1023 (11th Cir. 1982), in that Plaintiffs have claimed INS engaged in a "pattern, program or scheme ... to violate [their] constitutional rights..." *Id.*, 676 F.2d at 1033. To the extent it is not clear from Plaintiffs' amended complaint, the Court finds they have invoked habeas corpus jurisdiction pursuant to 28 U.S.C. § 2241 and that jurisdiction exists pursuant to 8 U.S.C. § 1329 as well. *See Nguyen Da Yen v. Kissinger*, 528 F.2d 1194, 1202–03 (9th Cir. 1975), and cases cited therein.[41]

### G. ADMINISTRATIVE PROCEDURE ACT CLAIM—FAILURE TO PROMULGATE DETENTION POLICY AS A RULE

The evidence shows that prior to May 20, 1981, Haitian refugees arriving in this country, for whom the INS initiated exclusion proceedings, were detained for a brief period of time necessary for routine public health screening and released on parole into the community to relatives or voluntary agencies willing to act as sponsors. This "policy" abruptly changed sometime between May 20, 1981, and July 31, 1981; and a policy of detention was initiated. Under the new policy, parole is to be denied except for significant humanitarian reasons such as pregnancy or other health problems, extreme age or for the purpose of reuniting families. Pursuant to this policy, some class members have been in detention for over 10 months awaiting a determination of their right to remain in the United States.

The essence of Plaintiffs' claim is that the detention policy is illegal because it is a substantive rule that was not promulgated as required by the Administrative Procedure Act (hereinafter the "APA"). Under the APA, an administrative agency is prohibited from adopting any substantive rule unless it first publishes notice of the proposed rule and provides interested per-

sons an opportunity to comment. 5 U.S.C. § 553. Because this procedure was not followed, Plaintiffs claim the detention policy is void and unenforceable and that the Court must order their release.

Defendants admit that a new detention policy was instituted without employing rulemaking procedures, and that INS is an agency as defined by the APA. *See* 5 U.S.C. § 551(1). Notwithstanding these admissions, they contend Plaintiffs' APA claim lacks merit for two reasons. First, the Defendants say the change in detention practice is not a "rule" as that term is defined in 5 U.S.C. § 551(4). Second, assuming *arguendo* that the changes in detention and parole criteria constituted rulemaking, they argue the Attorney General's decision not to parole Haitian aliens would fall squarely within the Section 553(a)(1) and (b)(A) foreign policy and agency organization exceptions to the notice and comment requirements of 5 U.S.C. § 553.

Section 551(4) of Title 5 defines the word "rule" as:

> (4) the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting practices bearing on any of the foregoing.

This definition is inapplicable here according to the Defendants because "[i]n detaining the plaintiffs and other aliens, the Government is carrying out a clear legislative mandate. Accordingly, the Government need not rely upon any alleged rule of

---

**41.** The Court believes that its finding that jurisdiction exists to review parole decisions is consistent with all of the cases in this area. *Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Ahrens v. Rojas*, 292 F.2d 406 (5th Cir. 1961); *Petition of Cahill*, 447 F.2d 1343 (2nd Cir. 1971); *Rodriguez-Fernan-* *dez v. Wilkinson*, 654 F.2d 1382 (10th Cir. 1981); *Palma v. Verdeyen*, 676 F.2d 100 (4th Cir. 1982). While some of these courts found no merit to the aliens' claim for relief, jurisdiction to review those claims was never found to be lacking.

policy for its authority to detain plaintiffs. Instead, that authority is derived from an express statute."[42]

Although this argument appears to be initially convincing, when scrutinized, its superficial nature becomes readily apparent. The "legislative mandate" of section 235(b) is not as clear as Defendants would like the Court to believe.[43] Words used in statutes are to be given their ordinary meaning. *Perrin v. United States*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); *Malat v. Riddell*, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); *Banks v. Chicago Grain Trimmers Association*, 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968); *Burns v. Alcala*, 420 U.S. 529, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975). Detain means not only "arrest" or "keep in custody" but also "to delay", "to retard", or "to restrain from proceeding". Black's law dictionary 404 (5th ed. 1979). The phrase "shall be detained" could mean that an excludable alien shall be incarcerated until a final determination of his admissibility *or* that his entry into the United States should be delayed until inquiry is made at an exclusion hearing.[44] Parole is perfectly consistent with such a reading of section 235(b) because, by definition, parole "shall not be regarded as an admission of the alien..." 8 U.S.C. § 1182(d)(5). But regardless of which view of the statute is correct, this analysis demonstrates that INS' detention policy reflects *their* interpretation of the statute and, therefore, it is a rule as defined by the APA.

Even if section 235(b) evidences a Congressional intent to incarcerate excludable aliens, section 212(d)(5), not section 235(b) is the relevant statutory provision because section 212(d)(5) gives the Attorney General the power to release excludable aliens on parole.[45] The new parole criteria reflect INS' interpretation of the statutory conditions for release, to wit, "for emergent reasons or for reasons deemed strictly in the public interest." Clearly, when INS announced new criteria for release on parole, and the ensuing detention policy, it constituted an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy ..." which is a rule within the meaning of the Act.

In order to engage in rulemaking, the Act requires an agency to (1) provide adequate advance notice and publication of the proposed rule in the Federal Register; (2) afford interested persons an opportunity to participate through the submission of written data, views, or arguments, with or without opportunity for oral argument; (3) publish the final rule with a statement of basis and purpose not less than thirty days before its effective date; and (4) grant interested

---

**42.** *See* Government's Reply Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction, docket no. 223, filed Jan. 8, 1982, at 27.

**43.** Section 235(b) of the Act, 8 U.S.C. § 1225(b) provides in part:
> Every alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer.

**44.** The Court has not been called upon to decide whether Congress intended the term "shall be detained" to mean incarceration or simply preventing an entry from being made. While this Court intimates no view on Congress' intent in this regard, it notes that the Fourth Circuit has interpreted this language to authorize indefinite incarceration of a permanently excluded alien after an unsuccessful attempt to return him to his homeland has been made.

*Palma v. Verdeyen*, 676 F.2d 100, 104 (4th Cir. 1982).

**45.** Section 212(d)(5)(A) of the Act, 8 U.S.C. § 1182(d)(5)(A) provides in part:
> The Attorney General may, in his discretion, parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

persons the right to petition for the issuance, modification or repeal of a rule. 5 U.S.C. § 553(b)–(e).

The APA contains certain exceptions to the notice and comment requirements of Section 553. Specifically, the Act's requirements do not apply to (1) military or foreign affairs; (2) internal management or proprietary affairs; (3) interpretative rules, general statements of policy, or rules of practice and procedure; and (4) situations in which good cause exists for dispensing with notice and comment requirements. 5 U.S.C. § 553(a)(1), (2) and (b)(A). However, the courts have repeatedly recognized that the various exceptions to the notice and comment requirements of section 553 are to be narrowly construed.

> Congress was alert to the possibility that these exceptions might, if broadly defined and indiscriminately used, defeat the section's purpose. Thus the legislative history of the section is scattered with warnings that various of the exceptions are not to be used to escape the requirements of section 553. *See, e.g.* S.Doc.No. 248, 79th Cong.2d Sess. 19, 199, 258 (1946). . . . Further, the Senate Committee responsible for considering the APA concluded its report by investing courts with a "duty . . . to prevent avoidance of the requirements of the bill by any manner or form of indirection. . . ." *Supra*, 79th Cong.2d Sess. 19, at 217. In sum, as this court said in *Humana of South Carolina v. Califano*, 590 F.2d 1070, 1082 (D.C.Cir.1978). "The salutary effect of the Act's public comment procedures cannot be gainsaid, so only reluctantly should courts recognize exemptions therefrom."

*American Bus Association v. United States*, 627 F.2d 525, 528 (D.C.Cir.1980). *Accord, National Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377 (2d Cir. 1978); *Housing Authority v. United States Housing Authority*, 468 F.2d 1 (8th Cir. 1972).

It is the view of the Court that the Defendants' reliance upon the foreign policy exception is not well founded. The case law involving foreign policy exceptions is extremely sparse. Research has disclosed no Supreme Court decisions directly on point, nor any from the Fifth or Eleventh Circuits. The meager authority for finding in this area and the courts' narrow view of the APA exceptions are, in and of themselves, reasons for the Court to hesitate to find the exception applies here. Moreover, the cases cited by Defendants, *Malek-Marzban v. INS*, 653 F.2d 113 (4th Cir. 1981); *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980); *Narenji v. Civiletti*, 617 F.2d 745 (D.C.Cir.1979) are clearly distinguishable from the case *sub judice.*

Those cases involved challenges to regulations governing the immigration status of Iranian nationals in the United States during the hostage crisis. The "good cause" and foreign policy exceptions to the notice and comment provisions were found to apply because there was no way to predict how the regulations would have affected the "attitude and conduct of the Iranian government." 617 F.2d at 748. Under the circumstances, deference to the Executive's choice of procedures was advisable.[46] But the *Yassini* court emphasized the limited applicability of this exception in a footnote, stating that "[t]he foreign affairs exception would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs. *See Hou Ching Chow v. Attorney General*, 362 F.Supp. 1288 (D.D.C.1973). For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences. S.Rep.No. 752, 79th Cong. 1st Sess. 13 (1945). As we discuss, this is the case here." 618 F.2d at 1360 n.4.

Nothing in the record before this Court supports a finding that promulgation of the new parole criteria, under the provisions of 5 U.S.C. § 553, would have resulted in "un-

---

**46.** It is significant to note that in spite of the unstable situation in Iran, the regulations challenged in *Malek-Markzban v. INS*, 653 F.2d 113, 115 (4th Cir. 1981) were promulgated but not subject to notice and comment. In the case at bar no effort was made to comply with the APA.

desirable international consequences."[47] To the contrary, publication may have enhanced the deterrent effect of the new policy and deterrence is one of the goals the Government sought to attain by initiating the detention policy. At best, the connection between the detention policy and this country's conduct of foreign affairs is tenuous and certainly not substantial enough to find that it is exempted from the APA's rulemaking procedures under 5 U.S.C. § 553(a)(1).

The APA also exempts "interpretative rules, general statements of policy, [and] rules of agency organization, procedure or practice" from the notice and comment requirements. 5 U.S.C. § 553(b)(A). Although the Act draws this distinction, it does not define the differences between the categories themselves. The Government contends that the new release criteria constitute an interpretative rule or general statement of policy. The Court, however, must determine the category into which the rule falls. "[T]he label that the particular agency puts upon its given exercise of administrative power is not ... conclusive; rather it is what the agency does in fact." *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 481 (2d Cir. 1972); *Columbia Broadcasting System v. United States*, 316 U.S. 407, 416, 62 S.Ct. 1194, 1199, 86 L.Ed. 1563 (1942).

■ A substantive rule, subject to notice and comment procedures, as opposed to an interpretative rule which is exempt, is a rule made by an agency pursuant to its delegated power to make rules having the force of law if they are constitutional, within the granted power and issued according to proper procedure. K. Davis, Administrative Law Text § 5.03, at 126 (1972). The Attorney General's Manual on the APA defines substantive rules as "rules other than organizational or procedural ... issued by an agency pursuant to statutory authority and which implement the stat-

ute ... Such rules have the force and effect of law." *Id.* at p. 30 n. 3. Such rules change "existing rights and obligations." *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 482 (2d Cir. 1972); B. Schwartz, *Administrative Law* 154 (1976).

Interpretative rules are "rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." The Attorney General's Manual at 30 n.3 (1947). Perhaps the most often cited definition of interpretative rules is that provided by the District of Columbia Circuit: "Generally speaking, it seems to be established that 'regulations', 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means." *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir.1952); *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979).

A general statement of policy is a statement by an administrative agency announcing motivating factors the agency will consider, or tentative goals toward which it will aim in determining the resolution of a substantive question or regulation.

A general statement of policy ... is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, pressages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

*Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir.1974); *Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir. 1979).

Clearly, the new detention policy is not a general statement of policy that INS hopes to implement in the future. It is being implemented right now! Nor does it set a

---

**47.** Mere promulgation of the detention rules might have been sufficient if it took place, for example, in the midst of another boatlift. But the circumstances under which detention was initiated were not sufficiently of an emergency nature to allow the foreign policy exception to apply.

goal that future proceedings *may* achieve, for the change has been presented as a *fait accompli.* Immediately upon its effective date the former practice of freely paroling Haitians into the community ceased and a new policy paroling only humanitarian cases began. Thus, the new criteria for release is not exempt from APA requirements as a "general statement of policy".

In *Brown Express, Inc. v. United States,* 607 F.2d 695 (5th Cir. 1979), the Fifth Circuit stated:

> The proper test to be applied in considering a rule that may arguably fall under the exemptions for "procedural rules" is as stated by *Pharmaceutical Manufacturers Association v. Finch* : "[W]hen a proposed regulation of general applicability has a *substantial impact* on the regulated industry, notice and opportunity for comment should first be provided." 307 F.Supp. 858, 863 (D.Del.1970) (emphasis added). The exemption of section 553(b)(A) from the duty to provide notice by publication does not extend to those procedural rules that depart from existing practice and have a substantial impact on those regulated. *See Aiken v. Obledo,* 442 F.Supp. 628, 649–50 (E.D.Cal. 1977). Our inquiry, therefore, is not whether the rule is "substantive" or "procedural", but rather whether the rule will have a "substantial impact" on those regulated.

607 F.2d at 701–02.

Applying this test to the facts of the case at bar leads inescapably to the conclusion that the new detention policy is a substantive rule that is not exempt from the APA's rulemaking requirements. The new release criteria radically depart from the existing practice of regularly releasing Haitian aliens. It makes detention the rule, not the exception; and prescribes very narrow circumstances where parole will be allowed. Upon implementation, the new policy had an immediate and substantial impact on the Plaintiffs. The Court cannot think of any administrative action that would have a greater impact on a regulated group of people than a change in policy which results in their indefinite incarceration where, under the previous policy, they would have been free.[48] It is true that the prior policy was never formalized by a written requirement or by its adoption in a formal rulemaking proceeding. It is equally true that under the old policy, Haitians could not claim a substantive right to parole. But a change in a longstanding informal practice is as much a rule as repeal of a formal regulation if the result has a substantial impact on those regulated. *See Pharmaceutical Manufacturers Association v. Finch,* 307 F.Supp. 858 (D.Del.1970); *National Motor Freight Traffic Association v. United States,* 268 F.Supp. 90 (D.C.1967), aff'd per curiam, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). Here the policy change had a substantial impact, it constitutes a substantive rule and it should have been adopted in accordance with the APA's rulemaking provisions.

## H.  INVIDIOUS DISCRIMINATION QUESTION

The Court has concluded that the new detention policy was adopted in a procedurally defective manner and that Plaintiffs' continued incarceration pursuant to that policy is unlawful. Technically, the Court need not go further in order to resolve Plaintiffs' other claim for relief.[49]  However, considerations of judicial economy and

---

**48.** Based on the Court's finding in Section H1, *infra,* any rule or regulation that is promulgated must not be discriminatory on the basis of race or national origin. However, to the extent detention is a function of presentation of a prima facie asylum claim, the Court does not believe that reference to the applicant's national origin would necessarily constitute discrimination.

**49.** The Court has endeavored to rule on the propriety of Plaintiffs' detention as expeditiously as possible. In order to do so, the Court has not made factual findings or conclusions of law with regard to Plaintiffs' First Amendment claims. Depending on the type of relief awarded Plaintiffs and the speed with which it is implemented, the First Amendment claim may become moot. The Court will make that determination after the June 23, 1982, hearing on relief.

fairness compel the Court to reach the other issue because a failure to do so might require these parties to spend years litigating this case before the Court of Appeals only to have it returned here for findings on issues already tried.

## 1. THE EQUAL PROTECTION CONCEPT INCORPORATED IN THE FIFTH AMENDMENT

■ The Supreme Court has held that, under the Constitution, aliens seeking to enter the United States "may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by its sovereign United States Government. Such privilege is granted to an alien only upon such terms as the United States shall provide." *Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). Congress has plenary power to decide *which aliens* shall be allowed to enter and *what procedure* shall be used to determine their admissibility. "Whatever the procedure authorized by Congress is, it is due process as far as the alien denied entry is concerned." 338 U.S. at 543, 70 S.Ct. at 312, citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892); *Ludecke v. Watkins*, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948).

If an alien seeking admission could challenge the constitutionality of Congress' decision whether and how to admit him the sovereign's power to control its borders would be compromised. Accordingly the Supreme Court has said "the Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores." *Kwong Hai Chew v. Colding*, 334 U.S. 590, 596 n.5, 73 S.Ct. 472, 477 n.5, 97 L.Ed. 576 (1953). But the Court has never held, as Defendants contend, "the Constitutional guarantees of the Fifth Amendment do not extend to unadmitted aliens."

Plaintiffs are excludable aliens. Their ultimate goal appears to be admission to the United States. However, their claim before this Court does not relate to admission and does not challenge Congress' power in that regard. Plaintiffs' claim is that they cannot be denied parole, pending a determination of their admissibility, because of their race and/or national origin.

■ Parole by definition "shall not be regarded as an admission of the alien . . ." 8 U.S.C. § 1182(d)(5). The parole sought by Plaintiffs consists of temporary release into the community while their political asylum claims are being prepared and processed; a process that can take years, if appealed. Parole, in this sense, is equivalent to pre-trial bond for a criminal defendant. In both cases, the primary considerations are protection of the community and ensuring that the individual appears for trial. When requesting release on parole, Plaintiffs are entitled to the same constitutional protections afforded all persons within the territorial jurisdiction of the United States. *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886); *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896); *Doe v. Plyler*, 628 F.2d 448, 454 (5th Cir. 1980), *app. pending*, 50 U.S.L.W. 3462; *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1388 (10th Cir. 1981). Plaintiffs may not be deprived of their liberty without due process of law and cannot be denied parole solely because of their race and/or national origin.

■ It is important to note that the actions challenged herein are *not* Congressional. Plaintiffs allege the Defendants are applying a neutral statute in a discriminatory fashion. This distinction, between legislation and enforcement, is critical. *Congress* can legitimately make distinctions among and against aliens that would be unacceptable if applied to citizens, *Mathews v. Diaz*, 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976), but "[i]n the *enforcement of these policies*, the Executive Branch of the Government must respect the procedural safeguards of due process." *Galvan v. Press*, 347 U.S. 522, 530, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954) (Frankfurter, J.), cited in, *Fiallo v. Bell*, 430 U.S. 787, 792 n. 4, 97 S.Ct. 1473, 1478 n. 4, 52 L.Ed.2d 50 (1977). (Emphasis added). "A statute, otherwise neutral in its face, must not be applied so as invidiously to discriminate on the

basis of race. *Yick Wo v. Hopkins*, 118 U.S. 356, 369 [6 S.Ct. 1064, 1070, 30 L.Ed. 220] (1886)." *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

## 2. PROOF OF DISCRIMINATION UNDER THE FIFTH AMENDMENT

██ While the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is "so unjustifiable as to be violative of due process." *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Schneider v. Rusk*, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); *United States v. Perez-Hernandez*, 672 F.2d 1380 (11th Cir. 1982). The "[E]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 23, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976); *United States v. Perez-Hernandez*, 672 F.2d 1380 (11th Cir. 1982). Thus, the analysis in cases involving claims of discrimination of federal officers in violation of the Fifth Amendment parallels the equal protection doctrine under the Fourteenth Amendment.

██ The type and level of proof required to establish a *prima facie* case of discrimination on the basis of national origin is essentially the same as that required in cases of racial discrimination. *See e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), cited in *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1976); *Castenada v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1976). In order to establish a claim of discrimination under the Equal Protection clause, Plaintiff must show the Defendant intentionally or purposefully discriminated against him. 429 U.S. at 265, 97 S.Ct. at 563; *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 205, 93 S.Ct. 2686, 2696, 37 L.Ed.2d 548 (1973); *Wright v. Rockefeller*, 376 U.S. 52, 56–57, 84 S.Ct. 603, 605–06, 11 L.Ed.2d 512 (1964); *Akins v. Texas*, 325

U.S. 398, 403–404, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692 (1945). A plaintiff need not prove that a discriminatory purpose was the sole, dominant or even primary purpose in the challenged action, but must show it has been "a motivating factor in the decision." *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). The plaintiff need only show that the challenged decision was "in part" the result of a discriminatory purpose. *City of Mobile v. Bolden*, 446 U.S. 55 at 72 n. 17, 100 S.Ct. 1490, 1502 n.17, 64 L.Ed.2d 47 (1980); *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). No particular degree of discriminatory intent need be shown, only its existence.

The Supreme Court, in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), outlined the factors a Court should consider in a case of alleged discrimination.

Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another." *Washington v. Davis, supra*, [426 U.S. 229] at 242 [96 S.Ct. 2040 at 2049, 48 L.Ed.2d 597]—may provide an important starting point.

Sometimes a clear pattern unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] (1886); *Guinn v. United States*, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340] (1915); *Lane v. Wilson*, 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281] (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is

not determinative, and the Court must look to other evidence.

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. *See Lane v. Wilson, supra; Griffin v. School Board,* 377 U.S. 218 [84 S.Ct. 1226, 12 L.Ed.2d 256] (1964); *Davis v. Schnell,* 81 F.Supp. 872 (SD Ala.), *aff'd per curiam,* 336 U.S. 933 [69 S.Ct. 749, 93 L.Ed. 1093] (1949); cf. *Keyes v. School Dist. No. 1, Denver, Colo., supra,* [413 U.S. 189] at 207 [93 S.Ct. 2686 at 2697, 37 L.Ed.2d 548]. The specific sequence of events leading up to the challenged decision also may shed some light on the decision maker's purposes. *Reitman v. Mulkey,* 387 U.S. 369, 373–376 [87 S.Ct. 1627, 1629–1631, 18 L.Ed.2d 830] (1967); *Grosjean v. American Press Co.,* 297 U.S. 233, 250 [56 S.Ct. 444, 449, 80 L.Ed. 660] (1936). Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached. The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege. *See Tenney v. Brandhove,* 341 U.S. 367 [71 S.Ct. 783, 95 L.Ed. 1019] (1951); *United States v. Nixon,* 418 U.S. 683, 705 [94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039] (1974); 8 J. Wigmore, Evidence § 2371 (McNaughton rev. ed. 1961).

429 U.S. at 267–268, 97 S.Ct. at 564–65.

■ Other factors which courts may consider in determining the existence of discriminatory purpose are: the foreseeability of discriminatory impact, *Columbus Board of Education v. Penick,* 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2949–50, 61 L.Ed.2d 666 (1979); knowledge of discriminatory impact, *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1050 (6th Cir. 1977); absence of any valid interest being served, *United States v. Texas Education Agency,* 564 F.2d 162, 168 (5th Cir. 1977) (Austin III), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); and the availability of less discriminatory alternatives, *United States v. Board of School Commissioners of Indianapolis,* 573 F.2d 400, 413 (7th Cir. 1978). With these factors in mind, the Court will now proceed to address the case before it.

### 3. DISPROPORTIONATE IMPACT

■ It is undisputed that Haitians are impacted to a greater degree by the new detention policy than aliens of any other nationality at the present time. The question is whether this fact is unexplainable on grounds other than race and/or national origin. The evidence shows that a major reason for the continued incarceration of Haitians is the injunction that prevents the holding of exclusion hearings *only* for Haitians. The injunction was entered at the behest of Plaintiffs' counsel herein prior to assignment of this case to the undersigned Judge.

Another reason is the State Department's position, be it right or wrong, that a prima facie case of asylum is not established solely by virtue of the fact that a Haitian national has left his homeland. Without the opportunity to present further evidence that there is a well-founded fear of persecution upon return to Haiti, the individual Plaintiffs herein cannot establish a prima facie case of asylum thereby entitling them to release on parole. Finally, there is some evidence in the record that aliens of other nationalities, particularly Mexicans, when faced with the choice of staying in detention or voluntarily departing the country, choose the latter alternative.

On the other hand, Haitians cannot voluntarily withdraw their applications for admission without Court approval and, therefore, release of Haitians who desire to voluntarily depart is significantly delayed. All of these factors combined result in the situation that exists today and the consequen-

tial appearance of a disproportionate impact on Haitians.

### 4. HISTORICAL BACKGROUND

Throughout the trial of this cause, Plaintiffs have emphasized Judge King's finding in *Haitian Refugee Center, Inc. v. Civiletti,* 503 F.Supp. 442 (S.D.Fla.1980), that INS discriminated against Haitian nationals when their asylum claims were denied *en masse.*[50] Plaintiffs believe, and would like this Court to conclude, that the practices challenged herein are a mere continuation of the prior INS policy against excludable instead of deportable Haitians. The Court finds, however, that Plaintiffs' contentions in this regard are simply without merit.

The policies and practices challenged herein, including detention, were proposed to and approved by the President of the United States in the context of developing a comprehensive new immigration policy. A change in policy was needed because the old one was not working. This fact was demonstrated by the increased flow of Haitians to South Florida during the years 1977 to 1980 and by the massive influx of Cubans during the boatlift in 1980. After making the decision to grant these and other illegal aliens amnesty, measures had to be taken to ensure that another crisis, requiring another mass amnesty, did not develop. These measures were intended to be applied to all aliens regardless of their race or national origin.

### 5. DEPARTURE FROM THE NORMAL PROCEDURES

The change in our immigration policy was accompanied by radical departures from the prior procedures in exclusion proceedings. Plaintiffs were subjected to these new procedures but they were not alone. The Court intimates no view on whether these practices in and of themselves constitute a denial of due process but it firmly believes that the manner in which they were applied did not violate Plaintiffs' right to equal protection of the law.[51]

### 6. INTENT

Determining whether an invidious discriminatory purpose was a motivating factor in Defendants' actions is not an easy task. Such a determination is substantially more difficult to make where, as here, there is no direct evidence of intent to discriminate and the Court is left to decide whether a preponderance of the circumstantial evidence proves intent.

This Court has been struggling with that decision for five weeks. It has examined the exhibits and testimony and has pondered the reasonable inferences that can be drawn therefrom. Having reviewed the record in this cause and being otherwise duly advised, it is the view of the Court that the historical background, the departures from the prior procedures and the apparent disproportionate impact of the detention policy on Haitians do not establish by a preponderance of the evidence that the Defendants intended to discriminate against Plaintiffs because of their race and/or national origin.[52] "The fairness of a law [or policy] does not consist of its effect being actually felt by all alike but in its

**50.** The Eleventh Circuit's opinion in *Haitian Refugee Center, Inc. v. Smith,* 676 F.2d 1023 (11th Cir. 1982) was issued subsequent to this Court's decision in the case at bar but prior to issuance of this opinion. The Court believes that the Eleventh Circuit's analysis of the due process issue is substantially consistent with the reasoning herein. *See* note 54, *infra.*

More importantly, the Court believes that it is significant to note that the Eleventh Circuit's opinion specifically refrained from affirming that part of the district court's opinion which held the Haitians were victims of unlawful discrimination on the basis of national origin. *See Id.* at 1032. This Court believes that the Eleventh Circuit's action in this regard substantially reduced the precedential value and weight to be given to the finding of discrimination. Plaintiffs' argument that INS has a history of discrimination against Haitians was treated accordingly.

**51.** The Court is specifically referring to immediate service of the I–122, interviews with the aliens prior to their exclusion hearing without counsel being present and mass exclusion hearings.

**52.** While the Court finds that the detention policy does not violate Plaintiffs' right to equal protection because it was not motivated by any discriminatory purpose, it finds that to the ex-

having been laid down for all alike."[53] The Court is convinced that Defendants intended to be fair and that if another class of aliens arrived in this country in a situation similar to that of the Plaintiffs they would be treated in a similar fashion.[54]

## I. CONCLUSION

The worst that can be said of the manner in which INS implemented its new immigration policy is that it was not well planned or executed and consequently it sometimes appeared to be arbitrary or inconsistent. The appearance and allegations of discrimination in the case at bar could have been avoided by promulgation of the new detention rule pursuant to the APA. The APA's notice and comment requirements are not merely technical; rather they are significant requirements designed to assure the quality and responsiveness of agency policymaking:

tent the policy withdrew discretion from the District Director to grant deferred inspections to undocumented Haitians arriving aboard non-signatory carriers, it violates due process. *See Petition of Cahill*, 447 F.2d 1343 (2d Cir. 1971). Thus any rule or regulation promulgated pursuant to this opinion must preserve the District Director's power in this regard unless the regulations are amended. *See* 8 C.F.R. § 212.5.

**53.** Seneca, *Letters to Lucilius*, 107.
Based on the Court's factual finding that Defendants did not discriminate against Plaintiffs within the meaning of the Fifth Amendment, the Court finds Plaintiffs' claims pursuant to Article 3 of the Protocol to be without merit. Similarly, with regard to Plaintiffs' claims under Article 31, the Court finds that they too lack merit. Plaintiffs' detention was not in violation of Section 1 because it was not intended to be a penalty. Detention was imposed as a part of the administrative process pending resolution of Plaintiffs' claims for asylum. To the extent detention was used for its deterrent effect the Court does not believe that its function in this regard should be equated to punishment. Detention was never imposed as a criminal sanction for the means by which Plaintiffs entered this country and is therefore not within Section 1 of Article 31. Moreover, to the extent that it was necessary for efficient administrative processing of Plaintiffs' claims for admission, the detention did not violate Section 2 of Article 31.
Finally, the Court believes that to the extent detention is authorized by statute that the protocol does not give Plaintiffs an independent cause of action for release. The history of adoption of the protocol makes clear that all the individuals involved in adopting it did so with the belief that it would not alter or enlarge the effect of the existing immigration laws. *Ming v. Marks*, 367 F.Supp. 673 (S.D.N.Y. 1973), *aff'd* 505 F.2d 1170 (2d Cir. 1974).

**54.** Subsequent to the drafting of the equal protection portion of this Court's opinion, two significant appellate court rulings in this area have been issued. The first decision rendered by the Eleventh Circuit Court of Appeals held that "the executive is subject to the constraints of due process in implementing and enforcing congressional immigration policy." *Haitian Refugee Center, Inc. v. Smith*, 676 F.2d 1023 at 1037 (11th Cir. 1982).
The second opinion rendered by the United States Supreme Court just this Tuesday, June 15, 1982 held:
*Whatever his status under the immigration laws*, an alien is surely a "person" in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as "persons" guaranteed due process of law by the Fifth and Fourteenth Amendments. *Shaughnessy v. Mezei*, 345 U.S. 206, 212 [73 S.Ct. 625, 629, 97 L.Ed. 956] (1953); *Wong Wing v. United States*, 163 U.S. 228, 238 [16 S.Ct. 977, 981, 41 L.Ed. 140] (1896); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 [6 S.Ct. 1064, 1070, 30 L.Ed. 220] (1886). Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government. (Emphasis supplied)
*Plyler v. Doe*, —— U.S. ——, ——, 102 S.Ct. 2382 at 2391, 72 L.Ed.2d 786 (1982) *citing Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976).
While neither of these opinions squarely address the question of the constitutional protections afforded unadmitted aliens present within the territorial jurisdiction of the United States, they lend support to this Court's conclusion that such aliens are entitled to the protections afforded all persons by the Fifth Amendment provided they are not seeking to invalidate Congressional actions relating to their admission. In other words, the Executive is constrained by the limits of due process when dealing with unadmitted aliens physically present in the United States.
The Court feels these two recent appellate decisions are a natural extension of the prior law regarding the Fifth and Fourteenth Amendment protections due aliens. Although this Court has made the next logical step in this progression, Plaintiffs were unable to establish that Defendants violated the Constitutional guarantees afforded them.

Section 553 was one of Congress' most effective and enduring solutions to the central dilemma it encountered in writing the APA—reconciling the agencies' need to perform effectively with the necessity that "the law must provide that the governors shall be governed and the regulators shall be regulated, if our present form of government is to endure." S.Doc. No. 248, 79th Cong.2d Sess. 244 (1946), *quoting* H.R.Rep. No. 1149, 76th Cong., 1st Sess. 2 (1939). The "principal purpose" of section 553 was "to provide that the legislative functions of administrative agencies shall as far as possible be exercised only upon public participation on notice .... " *Id.* at 257. Congress thus selected public participation in rulemaking as its means of assuring that an agencies' decisions are both informed and responsive. As we have said before, "if the agency in carrying out its 'essentially legislative task', has infused the administrative process with a degree of openness, explanation and participatory democracy required by the APA, it will thereby have 'negate[d] the dangers of arbitrariness and irrationality in the formulation of rules ...' "

*American Bus Association v. United States*, 627 F.2d 525, 528 (D.C.Cir.1980). The notice and comment provisions "were designed to assure fairness and mature consideration of rules of general application." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). These provisions afford an opportunity for "the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Texaco, Inc. v. Federal Power Commission*, 412 F.2d 740, 744 (3rd Cir. 1969).

These policy reasons for the rulemaking procedure apply with equal force in the field of immigration. It matters not that those regulated are outside the country and cannot reasonably be expected to receive notice and to participate in rulemaking proceedings. That function is performed by the watchdogs of the rights of the regulated.

Congress realized that an agency's judgment would only be as good as the information upon which it drew. It prescribed these procedures to ensure that the broadest base of information would be provided to the agency by those most interested—and perhaps best informed— on the subject of the rulemaking at hand. See *Shell Oil v. FEA*, 574 F.2d 512, 516 (Em.App.1978).

Defendants' unilateral formulation and implementation of the new detention policy was contrary to the letter and spirit of the APA. Plaintiffs' reaction to INS' continued enforcement of that policy was not motivated by any desire to circumvent the law. Rather, Plaintiffs' actions were designed to ensure that the Government follows the procedural safeguards that Congress established to protect *all* persons from arbitrary Government action.

A law is imposed on others by way of a rule and measure. Now a rule or measure is imposed by being applied to those who are to be ruled and measured by it. Therefore, in order that a law obtain the binding force which is proper to a law, it must be applied to the men who have to be ruled by it. Such application is made by its being notified to them by promulgation. Therefore promulgation is necessary for the law to obtain its force. Thus ... the definition of law may be gathered; and it is nothing other than an ordinance of reason for the common good, made by him who has care of the community, and promulgated.

Aquinas, *Summa Theologica*, I–II, 90, 4

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby

ORDERED AND ADJUDGED as follows:

1. Plaintiffs have established that the new detention policy, whereby excludable aliens are placed in detention until they establish to INS' satisfaction a prima facie claim for admission, was not adopted in accordance with the requirements of the Administrative Procedure Act. Because Defendants failed to give interested persons

notice and an opportunity to comment on the new detention policy and thereafter to promulgate that policy in the Federal Register 30 days prior to its implementation, the Court finds the rule pursuant to which Plaintiffs are incarcerated to be null and void.[55]

By its ruling, the Court does not mean to say that detention in itself is unlawful. That question must be left to another day. The Court holds that when the Government changed its long-standing policy of freely paroling Haitians to a policy of incarcerating them while they litigate their claims for admission to this country, it did so in a procedurally improper way. Those procedures are designed to protect all persons, aliens and citizens alike. Unless and until INS adopts a detention rule or regulation as required by law, this Court will not sanction enforcement of their new detention policy. Accordingly, the Court finds in favor of the Plaintiffs on their Administrative Procedure Act claim as set forth in Count II of the Complaint.

2. Plaintiffs have failed to prove by a preponderance of the evidence that they were incarcerated because of their race and/or national origin. The evidence shows that the detention policy was not directed at Plaintiffs because they were black and/or Haitian, but because they were excludable aliens unable to establish a prima facie claim for admission and that non-Haitians were detained pursuant to this policy as well. The mere fact that more Haitians were detained and kept in detention for longer periods of time than aliens of other nationalities does not render the policy discriminatory. Regardless of its ultimate impact, the policy was intended to be applied and was in fact applied equally to all similarly situated aliens regardless of their race and/or national origin. Accordingly, the Court finds in favor of the Defendants as to Count VII of the Complaint.

3. The parties are hereby directed to appear at a hearing that is set to commence at 2:00 o'clock p. m. on Wednesday, June 23, 1982 for the purpose of determining the effect of this Court's ruling, the remedy to be afforded Plaintiffs, how that remedy is to be effected and the extent to which this Court should retain jurisdiction over this cause. The Court invites participation at said hearing of all other interested parties including but not limited to the State of Florida, Metropolitan Dade County, the Dade County Bar Association, the Florida Bar, the American Bar Association and other organizations that might assist in implementing any proposed plan arising out of said hearing. It is the Court's intent to utilize the assistance of the Committee heretofore appointed by this Court and their attendance is likewise requested.

---

55. 5 U.S.C. § 552(a); 5 U.S.C. § 552(a)(1)(D); 5 U.S.C. § 553. *Parco v. Morris*, 426 F.Supp. 976 (E.D.Pa.1977).